Council, we're here on Johnson v. City of Philadelphia and we'll have appellant of course proceed and if you could please let me know what you'd like to reserve for rebuttal. I certainly will your honor. Good morning, good morning panel members. My name is Leonard Valeri with the law firm of Valeri Lenton in this matter against the City of Philadelphia. I would kindly ask for two minutes of rebuttal time. Very well, that's granted. Go ahead sir. Thank you your honor. Your honor, as everyone knows this is a very tragic event that occurred in March of 2018. It was a fire involving my client's three relatives. Horace McComb was 63 years old. There is a young child and there is a Alita Johnson, the sister of Tameka Johnson. When the fire is called in, the fire starts at approximately 1130 a.m. It is called in, and this is significant, it is called in by Alita Johnson at 1138 p.m. to the 911 operator who transfers her immediately over to a fire department operator where she gives their location and is then instructed to go into the back room to close the door, to open a window, and to place a towel under the door and that police would be there, that they should stay calm, and that they should await, I'm sorry, that the fire department will arrive and that they will come to rescue them. It is that... Mr. Valeri. Yes sir. Relax, there will be questions. We're aware of the tragic circumstances of the case and we're also, I want you to please assume that we're thoroughly familiar with the basic facts. I have a question for you. Now, the point that you were just at is where my question arises. My understanding, and you'll correct me if I'm wrong, is that the Alita Johnson is in touch initially with the 911 operator and is then put in touch with the PFD operator, correct? That is correct, your honor. The PFD operator is then in touch with the PFD dispatcher is obviously in touch with the firefighters. In constant communication with the firefighters over the course of fighting that fire, correct your honor? Very, very good. Now, based on your complaint, it appears that the following is also true. Ms. Alita Johnson is never in touch with the PFD dispatcher, is that correct? That is correct, not by direct communication, only through what she is telling the PFD operator. Totally, but I want to establish that, right? So, Ms. Alita Johnson is never in touch with the PFD dispatcher. That is correct, your honor. Now, the PFD operator is never in touch with the firefighters. That is also correct, your honor. So, the only basis for the PFD dispatcher to have information about Ms. Alita Johnson is through the PFD operator. That is also correct, your honor. Okay, so now in your complaint, you charge that the PFD operator and the PFD dispatcher knew all of the facts that Ms. Alita Johnson had relayed to the PFD operator. That is correct, your honor. Okay, now that's where I want to delve into a bit of questioning. If the PFD operator related to the PFD dispatcher everything that she knew from Ms. Alita Johnson, then the PFD operator can't be responsible for what the firefighters learned because she would have, according to the complaint, she would have done everything that she was supposed to do, which is relate to the PFD dispatcher the location of Ms. Alita Johnson and her relatives, and the fact that they were in distress, and the fact that they needed help. So, that's what I just wanted to make sure that we agreed on that. We do agree on that. We just certainly don't know at this point in time because the radio communications that we received from the City of Philadelphia, which we preserved in litigation, gives us two separate bands. The band between, actually three, the 911 call to the regular operator, then the communications between Alita Johnson and the Jane Doe operator, and then the dispatcher's communications with the fire department, but there are no audio tapes, at least that I am aware of, between what is being transmitted from the Jane Doe operator and the Jane Doe operator. So, there's no basis to know exactly what that communication was, other than the substance of what you know the PFD dispatcher told the firefighters. Correct, Your Honor, and obviously we would know more respectfully that the 12B6 motion was granted. Can I jump in at this point? I'm sorry, yes, of course. It's Judge Porter. So, I'm looking at, I'm picking up on Judge Greenaway's questioning, and I'm looking at paragraphs 34 and 35 of the complaint. Paragraph 34 says the operator instructed Ms. Johnson to stay in the room and put the towel on the door and all Once the operator had the correct address, she relayed the correct address to the dispatcher, who then rerouted the firefighters to the correct address, but then it says the dispatcher never informed the firefighters that Ms. Johnson were in that room waiting, and that seems to me to be a disconnect, because you don't say that the operator, you say the operator told the dispatcher the correct address, but the complaint never says the operator told the dispatcher about the advice that she'd given to the Johnsons. So, um, I'm sorry to interrupt, Your Honor, go ahead. Yeah, my question is, how do you fault the dispatcher for not giving information to the firefighters that we don't know if she ever received from the operator? We know that, we know this much, Your Honor, we don't know much from the Jane Doe dispatcher about them being on the third floor, because in the, in the radio communications between the Jane Doe dispatcher and the fire department, the dispatcher is heard saying we are getting reports of people on the third floor, so we at least know that much. What we don't know is the detail to which the Jane Doe operator instructed the Jane Doe dispatcher that she had secreted them into that room, but we do know at least that there was an initial relation of some type of information between the Jane Doe operator and dispatcher, otherwise the dispatcher would not have been able to communicate to the firefighters that there have been reports of the fire on the third floor, and importantly, Your Honor, that initial communication with the Jane Doe dispatcher was when they had routed the fire department personnel to the wrong address, so it was never repeated in anything that I have heard on the 911 tapes from the dispatcher to the fire department after she rerouted them to the correct address to say either, one, I have more information on the third floor where you're waiting in a closed room for you, or two, that you are now going to 21st Street instead of 23rd Street, remember that there are people on the third floor. In fact, it is so vague, it's not even a matter of people on the third floor, it's a matter of there are reports on the third floor, is what is on the 911 tape, so in that regard, you're correct, Your Honor. Okay, that's helpful, thank you. If I can switch gears a little bit, then how do you get from the failure to, by the dispatcher, to say a second time to the firefighters, hey, remember there's someone on the third floor, that might be negligent, tell us why it shocks the conscience. Your Honor, the dispatcher doesn't say anything more to the firefighters other than that you're correct, that there are reports on the third floor. The issue in this case that brings it beyond negligence and into a state created danger case, is that the dispatcher and the operator acting in concert, took actions which made our client's decedents more vulnerable to harm in this case, and what I mean by that is, if there is an instruction by the Jane Doe operator to stay in a certain place, stay at the pickup point, we are assuring you that the fire department knows where you are they know that you are going to stay there, and that you are to remain there because that is where they will go to look for you. That takes it out of ordinary negligence, Your Honor, and creates an action by the state which led to additional harm to these individuals, because they did have an opportunity to act upon themselves. Now, I'm not saying that they put them in essence in custody, like some of the cases for state created danger, but what I am saying is that they restricted their movement in such a way, with reliance on a very important fact, that the fire department will be told where to look for them, and that action in doing so, without ensuring that the fire department knew more, and we know that they didn't know more because they never searched for the third, they never searched the third floor for them, they were found three, they were found three days later. We know that they relied on that information, we know that that act created harm for them, and ultimately led to their death. Well, let me ask you this as a follow-up to Judge Porter's question. As you focus on this notion of the instruction, as you say, restricting their movement, there's nothing in the complaint about the Now, I understand how you could say the instruction is an affirmative act, but you allege in the complaint that they could have gone out a window onto the second floor roof. Correct. But the PFD operator didn't know that, so how is the, you know, we can talk for a moment about the degree of culpability and what should apply, but just as a general matter, how can you ascribe that to the PFD operator when the operator did not know there was a choice and did not make a decision for Miss Alita Johnson and her relatives based on that? Well, she's the 911 operator. She's there to offer advice in this instance. She took it upon herself to offer advice, and yet she never asked Alita Johnson. Part of our claim under Monell is that the policies and procedures of the fire department in this instance are defective. There was a failure to train, and there was deliberate indifference as to their own policies and procedures. Had a proper, it's part of our argument, and it's part of our case, that had the fire department had appropriate policies in place when it involves transfer of information between a victim of either a crime or a fire, and the fire department, it has to be relayed in such a way that all parties are on the same page. So that's one to answer your question, and then, I'm sorry, go ahead, Your Honor. No, no, please. You had a second point? I'm so sorry. Well, and honestly, Your Honor, my second point is, if you volunteer to take upon yourself as the fire department operator did in this case to place them in a certain area, you should at least know what their options are when that instruction is to secret yourself in a room, and most importantly, close the door. Now, I understand it's common sense. Close the door so you don't have smoke inhalation. Put the towel under the door because you don't, you want to avoid smoke inhalation. Open the window for the same reason. However, if you are doing that, you are now restricting the fire department's ability to know that they're there or to locate them. So I think it was incumbent upon the Jane Doe operator, quite frankly, in offering that advice to actually have a full understanding of the layout of the property and their chances for survival because that Jane Doe operator already knows that the 911 operator made a mistake, and now they're delayed in getting to that location, and that's knowledge within the Jane Doe operator's repertoire in terms of what advice she's going to offer, and because of that reason and knowing that they're now delayed, if I were the Jane Doe operator and there were proper policies and procedures in place to teach the Jane Doe operator, my argument to you would be that she should understand all of the risks that Alita Johnson and her family is operating under before she gives advice that led to the fatal demise of these three if I could just follow up at that time. Okay, I appreciate that. Thank you. You bring up the Monell claim, and I think that you, not to argue the merits of your Monell claim, but clearly the district court didn't get into a discussion of the custom policies and procedures. So, you know, I see a clear argument that it should go back to that consideration, but with regard to putting a greater onus on the PFD operator, let me ask you this question. The district court deemed that this was a hyper pressurized environment, which applies one standard with regard to the shocking the conscience rubric, right? Judge Swansky did do that, yes, sir. Right, and I know that you're arguing no, it should be the second level of culpability, but let me ask you, when the Supreme Court and Lewis talked about the, I don't think they termed it hyper pressurized, but essentially that's what they were talking about, they were talking in that context about police officers that had to make decisions in haste, under pressure, frequently without the luxury of a second chance, split-second judgment. Tell me why that shouldn't be the same rubric that's applied here, because the PFD operator seems to be not in exactly the same position as a police officer, but this is certainly a, you could argue, a split-second judgment, fast-paced decision. Mrs. Johnson, I'm sure, is in an altered state of mind, seeing everything that's happening around her and the people that she loves. So tell me why we shouldn't apply that hyper pressurized environment? I think that we finally got to, and not to say that the other questions weren't important, but I think this case rises and falls in terms of the state-created danger on exactly what you're asking me. Which standard did we apply to the Jane Doe operator and Jane Doe dispatcher? And you used all the right adjectives that they used in Lewis in terms of a high pressure environment and so forth and so on. You know the facts of the sheriff pulled over or was involved in one incident. As he's finishing up that call, a motorcycle driving at a very high rate of speed passes him and then continues onward with speeds of up to a hundred miles per hour, and we know that the sheriff was driving that fast. In that instance, that sheriff's state of mind, or that law enforcement official's state of mind is, here are my competing interests. I had two idiots on a motorcycle going a hundred miles per hour that can kill themselves. They can kill other individuals. In fact, there was evidence in that case that the motorcycle was driving so erratically that cars were moving out of the way and potentially causing other accidents. And then I have to balance those two competing interests with me harming myself and me harming the general public. And in that case, in that very particular case, under that particular set of facts, yes, that was a highly pressurized set of facts that that officer had to digest in a split second to ensure the public safety, their safety, and his own safety. In contrast to that, and why respectfully it is our position that the lower court erred in not applying the intermediate standard of a great risk of harm, as opposed to the higher standard in Lewis, you have a Jane Doe operator whose job it is, whose prime job it is, to take down information and relay information accurately. They are taught to be non-emotional about it. We know that from other cases. They are taught that they are to concentrate on their job, that they remain in silence, they remain in an area of the fire department dispatch where they are not distracted, and we also know in this case, unlike the officer in Lewis, we have a PFD operator on the phone from 1138 until the first call disrupts at 1140, and then an additional eight minutes on the phone with this individual. I'm not saying that it is the least standard where there is unhurried judgment and a luxury of time, like in the situation in the case where the warden was sued because he was not providing proper care to his inmates. He had plenty of time to think about what the right thing to do was, but this operator, unlike the police officer, was never faced with a split second decision. If she was with a split second decision, it was to relay the information to the responding fire department. Once her main task was to just comfort and ensure that these folks remained on the line and did the right thing. That's not highly pressurized. That could be considered hurried, but like the case law that follows these different standards, if anything within an hour to minutes, and we know we have eight to ten minutes of communication, this operator had the ability to actually relay the correct information to either the Jane Doe dispatcher or to ensure that it got to the fire department. Once that initial call was completed, she's no longer in a high-speed chase. She's back to just making sure that she comforts someone. That's why I think it's the intermediate standard in this case. Thank you, Judge Mady. Temple, just so that if you can help me make sure I understand your argument. You noted earlier that unlike other cases, there was not a restraint or taking into confidence. There was not a restriction of movement in the practical sense. Is it your argument then that the conduct here was sufficient to constitute an affirmative step, a deliberate choice, or that it's so analogous to those custody and control decisions that it should be indistinguishable from those outcomes? It's not, again, good afternoon, Judge Mady. It is not a situation involving confinement. It's not analogous to confinement in the custodial sense. It is analogous to the facts in Knight and Rebus, very clearly. Starting with Rebus, Your Honor, the harm in that case, which I think my colleague characterizes a different way, but my argument would be the conduct in Rebus that led to the plaintiff in that case being more vulnerable or causing the harm was the EMT's failure to relay information regarding this gentleman's seizures to the police officers that eventually responded and misconstruing and perhaps falsifying that she had been assaulted in the first place. In that case, when these officers arrived, their sense of urgency is heightened by the fact that this information was not properly relayed. That's the type of conduct that I'm talking about that doesn't involve custody, but involves a relaying misinformation or not the correct information, which was found actionable in Rebus. And then in Knight, a similar argument, the conduct causing harm to Samantha Knight was not the officer taking her into custody, which is what your question is, because Samantha Knight was in custody for a short while. Her husband was free to go. She was not free to go. Officer Tedder held her there at his car. I'm not arguing that the custody in Knight is what was the conduct that was harming her. The conduct was in removing her from her private source of rescue, which was her husband. And so in this case, just analogous to Knight, the harm is not so much taking them in the custody in the sense that they closed them in the room, but by closing them off to the firefighter's site and not telling the fire department where they were in their hyper pressurized environment. I hope that answers your question. So in the highest standard, we would be asking about a deliberate intention to cause harm. In the lowest standard, we would be talking about deliberate indifference. In the middle standard for which you're disregarded a substantial risk. And the behavior that was, I'm quoting now from Miller, that was so ill-conceived or malicious that it shocks the conscience. So my question is, what state of deliberation or what state of consciousness must you allege in order to afford liability to a patch? In terms of, this is Judge Porter, correct? Yeah. I'm sorry, Judge Porter. I'm starting to get your voices down. The standard has been refined, to my understanding, to this. Consciously disregarded a great risk, not just a significant risk, but a great risk that serious harm will result. I think the way you go about that, the way that you should go about it, is to follow the which is 876 F 3rd 424. That's a third-circuit case from 2017. You are all well aware that it is the case of the Pennsylvania State Trooper firearms instructor that did not check his gun before ridiculously, putting up again, put it in up against another State Trooper's head, pulling the trigger and killing the State Trooper tragically. In that case, the court dealt exactly with the question that you are asking me, Judge Porter. The court essentially said that, at least as it relates to our case, the operator's conscious disregard of a great risk of harm may be proven by circumstantial evidence, including one, evidence that the risk was obvious or a matter of common sense. I would submit respectfully, Judge Porter, that it is obvious and a matter of common sense. If you don't tell the fire department where these folks are and that they can't be seen, that harm will ensue, and it did in this case. It can also be, according to the third-circuit panel, and this in the Kedra case, evidence that the actor had particular professional training or experience. Well, we know that the fire department trains 9-1-1 operators. We do not know, because this was dismissed at the 12B6 stage. However, we know that they were professionally trained to relay proper and correct information and to ensure that the advice that they are giving is sound in terms of the safety of the others, in safety of the individuals who are there to protect. We know, in this case, that that did not occur and that the training, if there was training, that it was not followed by the 9-1-1 operator. And then they go on to state that evidence that the actor was expressly advised of the risk of harm and the procedures designed to prevent that harm and proceeded to violate those procedures. We aren't yet at that stage because we haven't taken the Jane Doe's operator, but just based on common sense, Judge Porter, we know that if you tell someone to go somewhere and hide and then you don't tell anybody else where they are, it's going to be a long time before they find them, and that turned out to be correct in this case through day fire. Do you have a follow-up, Judge Porter? No, thank you. Thank you, Judge Porter. Counsel, let me ask you this, if I may. Paragraph 3135 of your complaint, you talk about the dispatcher informed the firefighters that she was getting reports. You mentioned that earlier concerning the third floor of the building. There's a reasonable inference, I take it, that the firefighters received this information about Ms. Johnson and her family from the PD operator. My question is, the act that you're talking about to try to satisfy the fourth factor in the state-created danger, is really an act, it appears to be, you'll correct me if I'm wrong, an act of omission rather than an act of commission. An act of commission would be an affirmative act. An act of omission, it appears from our cases, would not be deemed an affirmative act. My reading of your complaint is, it's with regard to the PD dispatcher, it's the fact that she was getting reports, believe it or not, from the PD operator. So, talk to me about that if you would, because if it's an act of omission, I'm not sure we'd get very far. Well, Your Honor, two things, if I may. Thank you for your question. First, I don't, I respectfully resist agreeing with you in that there was an inference that the PD operator, anything. I've listened to those tapes that I told you that we secured. In no way, shape, or form do we know what was told of the fire department operator and what was told by the dispatcher to the fire department. So, it's not that I, it's not that I want to disagree with you, I just think that we don't know because we haven't deposed these individuals yet, but there's nothing on the tapes telling any fire department personnel going to the scene of this accident that there are people on the third floor and that they are secretive in a room, they are waiting rescue, and that they have the door closed. The only thing that we know, that the fire department knows, is there are quote, unquote, reports from the third floor. I don't know what that means, Judge, and I would submit that that isn't a fair, reasonable inference, at least as far as my argument is concerned. To go to the second part of your question, whether this is an act of omission or an active act, I think the courts, and forgive me, I can't remember the case, but there is case law, I think it was the United States Supreme Court, that said we cannot continue to get hung up on acts of omission versus affirmative acts. When we say affirmative, and it may be a third circuit case, but when we say affirmative, we're not saying an affirmative act. They have to make some kind of action that increases the vulnerability of these individuals. Your Honor, whether you want to call it an act of omission in not passing on the proper information to the fire department, or whether I want to argue that the affirmative act is placing them in the room and closing the door without doing more and without knowing more, I think we end up at the same result, which is they increase the vulnerability of these individuals, and that act, whether you want to call it an omission or affirmative, is what created their harm in this case. Thank you, Judge Greenwood. I just have a housekeeping question. The tapes are not in the record, right? They are not, Your Honor. Why not? The district court chose at the oral argument not to review them and asked counsel at the argument on the motion to dismiss whether he needed them to make a decision. Counsel for the city said no. I said no because I had actually said what was heard on the tapes. And I think that that is in the appendix where the district court agrees that he does not need to have the tapes. I think I even offered during the argument to provide them. Is there any information about whether there are tapes of the conversations between the PD operator and the PD dispatcher? You may have answered that, and I apologize if you did. The answer to that is no. What we requested is that, Your Honor, and if the city, and I have no reason to doubt them, if the city, through the fire department, accurately complied with our subpoena request, we did ask for that. We asked for anything with the Jane Doe operator and Alita Johnson, anything between the Jane Doe operator and the 911 operator, and any communications between Jane Doe and Jane dispatcher and Jane dispatcher and fire department. What we were returned was Jane Doe operator and Alita Johnson and Jane Doe dispatcher and fire department on two separate bands, radio bands. And the absence of that tape or taping or recording, is that part of your Monell claim? It is. In fact, that's been the gripe about the fire department forever, and the same thing with 911, is that no one can accurately connect the dots between the bands because their radio communication system is outdated. Now, how far that goes, I don't know yet because the 12B6 motion was granted, but that is certainly going to be an inquiry into discovery on the Monell claim because the fire department did not have crucial information from the Jane Doe dispatcher, nor does the city's radio transmission program allow for that to happen, when other places do have that type of technology. All right. Judge Porter? No, I'm good, John. And Judge Mady? Nothing further. All right. Counsel, we'll hear you on rebuttal. Thank you so much. And may we hear from Counsel for Pelley, please? Thank you, Judge Greenaway. This is Jane Nistvan. May it please the Court, and I represent the city FLEs in the matter. I think it's – I'd like to start out, I suppose, and you've got – with your permission, I'm sure you'll guide me where you want me to be. But I'd like to start out with Mr. Villar's representation that this case rises and falls on the culpability element because I submit that it doesn't. And Mr. Villar hasn't really explored what the precedent actually is on the fourth element on an affirmative exercise of authority, and that precedent forecloses his claim. We've gone through, you know, the lengthy argument on his part in a reply brief as well, and there's no mention of the Yee case and the Bright case, which interpret the Shaney. And I would submit that Mr. Villar constantly phrases this as an inquiry into whether a state actor did something that made the individual, or in this case, the family, more vulnerable to danger than they otherwise would have been. And I would submit that Yee and Bright will tell you that that's absolutely not the standard. And if it were, there would have been liability in Yee and Bright. And yet in those cases, the positive motions were granted because there was a lack of restriction of liberty in those cases. And they go back to interpreting the Shaney to come to that conclusion. And so I guess I'd point out that the theory here, to me, is no different than the theories in Yee and Bright. In Yee, the theory was that a public health doctor who told a man, you're fine, it's just a cough, go home. And the son ended up submitting an affidavit saying, I relied upon that information that the doctor gave me. And if he hadn't given me that information, I would have taken my dad immediately to the emergency room. And he would have been treated for congestive heart failure. And so I would submit that in that case, as Judge Smith found, as the panel there found, by the allegations, the doctor did in fact render the family, render Mr. Yee more vulnerable to danger. And yet that wasn't enough because allowing an individual to rely upon a representation that turns out to be inaccurate is insufficient. It's not restricting his liberty to blow up what the doctor said and go elsewhere. And I submit it's the same, it's essentially the same allegation as Bright as well. In Bright, there was an allegation that a police officer had told Mr. Bright that he would take a stalker, a man who had stalked one of Mr. Bright's other daughters, into custody for violation of parole. Ended up not doing that. And tragic circumstances resulted with the younger daughter being killed by the stalker. And the court there, and Mr. Bright made a similar representation. And in his response to the notion, he said, if I had known that this man wasn't going to take the stalker into custody, I would have left town. I would have taken other measures to protect my family. But again, that wasn't enough because allowing Mr. Bright to rely on the representation was not tantamount to something that's a restriction of liberty. And I would say it's the same thing here. Well, let's follow up on that. I have some other questions on another line, but let's just follow up on this for a moment. Here, the PFD operator had choices, right, as to what she said, right? She could have just given them assurances, you know, relax, hang tight. The firefighters would be there. They're on their way, right? She could have done what she did, which is gave specific instructions, do this and wait. She could have done something more fulsome, although I don't think that she was under any obligation to do that. So there were certainly choices here. Are you saying that by telling Alita Johnson and her family to go into the room that that wasn't restrictive? I mean, it's pretty specific. How is that not an affirmative act? Judge Greenlee, first of all, I would submit that it's more than just an affirmative act. It has to be something that's akin to a restriction of liberty. And I submitted the case yesterday. You probably haven't had a chance to look at it, but I guess I'd ask after argument, after Mr. Valares had a chance to respond to it. But that case kind of makes this very point that it's not a restriction of liberty for an operator to get it. In this case, the argument would be it's not a restriction of liberty for the operator to give them instructions on how to stay safe until help arrives. That's not a restraint of liberty, but something akin to incarceration or institutionalization. And I guess I'm going to say some things that bleed more into culpability, which were some points that I wanted to raise later that you had addressed. But I would also say that it creates a kind of perverse incentive to say, well, the state should really just say nothing because I assume that what we want as an incentive is for the operator to give them instructions on how to stay safe until the firefighters arrive. If you're rendering her liable for giving those instructions, then you're creating an incentive for her to do less to keep them safe, according to her perception. And Mr. Velardi sort of referred to this. This is why I think this is a problem on the culpability prong. She's not there, as you pointed out, Judge Greenway. She doesn't know the lay of the land. And I would imagine that the last thing that you want her doing is giving them all options and suggesting, well, you can stay in the room with the door closed to keep the smoke out until they get there,  which actually someone did, according to the allegations in that building. And when the firefighters arrived, they found that person deceased. So to me, it's a real problem to hang all that on the operator, which is what the State of Reap case, which I cited yesterday, points out. They're not there. And therefore, you can't interpret them as giving instructions that restrict someone's liberty. It's an operator. It's not a police officer. It's not a teacher. There's just no plausible way, under the Yvonne Twombly standard, to interpret, again, her instructions to you on how to stay safe until firefighters arrive as something that's a restriction on your liberty, as something that's akin to a custodial situation. I think all of us would like to know the 28J letter. You submitted it yesterday evening? Yes, Your Honor, around 5 o'clock. And I apologize. It's a 2016 case, and I should have found it when I was looking at our brief earlier. There's very little in the case law on this particular factual scenario of 911 operators. And so when I saw that case in reviewing, I thought it was worth pointing out, even though it is a qualified immunity case, as I pointed out. It does solely interpret the issue of whether a constitutional violation was clearly established. But it is helpful in the factual sense. Well, I can't speak for my colleagues, but I was prepping yesterday, but I wasn't looking after we got a 28J. Let me ask you this question. Given the fact that there were no amendments to the complaint, and the district court made no finding of futility, why shouldn't the plaintiff be given an opportunity to replead? When we look at Phillips, which is one of our cases from 2008, we said the district court erred when he dismissed the complaint without offering Phillips the opportunity to amend her complaint. It does not matter whether or not a plaintiff seeks leave to amend. We have instructed that if a complaint is vulnerable to 12B6 dismissal, a district court must permit a curative amendment unless an amendment would be inequitable or futile. Now, certainly, I know if given the opportunity, you would argue that it's inequitable or it could be inequitable or it may be futile. But in point of fact, the issue wasn't addressed by the district court. Why shouldn't we remand? I guess I would say two things on that, Judge Greenaway. First of all, on appeal, Ms. Johnson hasn't asked for that opportunity, and so I would submit she's way that she hasn't claimed that there was any error in not allowing her leave to amend. And second of all, I guess what I would point out is that there's... Well, it is futile. And further, this was the ground for our motion below. We actually did not argue culpability. We did argue the fourth element. And so I would submit that in the court below, Ms. Johnson had every opportunity to respond to these allegations and to say, hey, you're right about Ian Bright giving me an opportunity to amend to allege some kind of restriction of liberty. I know this is not in front of you and you're at a disadvantage, but I'll just repeat the section of the opinion. It does not matter whether or not the plaintiff seeks leave to amend. We've instructed that if a complaint is vulnerable to 12b-6, a district court must permit a curative amendment. Right. And I understand that that is the law, but it's also the law that on appeal, a talent was charged with knowing that and a talent was charged with raising that as a ground for error. And they didn't do so here. And further, as I pointed out, there's no prejudice in this situation because they did have every opportunity to respond to the argument that I just made. It's the exact same argument that we made below. So there's no sense of surprise here. Right. And then I would also pull back to... I mean, I don't want to leave the fourth element. And if the court has further questions, then I would also point out that because the court was also correct on the culpability issue that there's also no reason to send the case back for leave to amend as well. Judge Beatty? Nothing from me. Judge Porter? I just have the same question that I asked your colleague about the standard that we should be following and the consciousness or deliberation, how that fits into the standard. I'm sorry. I'm sorry, Judge Porter. That's a question with respect to the culpability issue. Yes. And which standard we should be applying to the operators and the dispatchers' conduct? Is it the highest standard, the deliberate and different standard, or the intermediate standard for, I guess, emergent but maybe not caught chase type situations? Okay. Before I pivot to that, I just want to point out that I just want to make sure that we're talking about the right standard with respect to affirmative exercise of authority, too, and that we're talking about applying ye and Brighton to Cheney because I think that's really important. Right. I understand that part of the argument. Thank you. So, with respect to the culpability, to culpability, I'd submit that Judge Swanski was correct in applying an intent to harm standard. There's an obvious need for an immediate communication of what the caller communicates to you as the operator to push that information on down the line. There's no opportunity for deliberation there. And so, if an operator leaves information out, I don't know how you can interpret that as anything other than negligence because of the timing issue. Noah's a very different case. Noah was a case where a social worker and an attorney for our office had hours to determine whether to find that a parent had abused the child or not. And that's simply not the same timeline here. And further, there are cases like Ducardie that do concern first responders. But in that case, the city didn't ask for intent to harm. And furthermore, the court pointed out the paramedics there weren't treating the case as an emergency. They were treating it as an intoxicated person. And so, there would be no reason to apply an intent to harm standard. But that doesn't apply here. And so, I submit that intent to harm is the proper standard to apply here. Let's say, for the sake of argument, that we don't apply intent to harm, but we apply shock to conscience. Do the allegations in the complaint meet that standard? No, and that was going to be my next point, Judge Porter. Because even if some sort of Miller flying scale standard applies, under the fact as alleged, there's not enough here to infer that there was any kind of abusive exercise of authority where you had, first of all, as you all pointed out, there's very little allegations with respect to the dispatcher. And I neglected to also point out that there's nothing there that satisfies the fourth element there. But moving back to the operator, she gave instructions on how to stay safe. She stayed on the phone for eight minutes. Therefore, you simply can't infer that she was committing some kind of subjective disregard that a great harm was going to occur to the family, that she appreciated that she hadn't actually told the firefighters everything they needed to know. And in fact, I think you can also take into account the fact that firefighters did show up and did try to get up to the third floor of that building and the staircase from the second to third floor collapsed and they had to be evacuated. So it's not even a situation like the Reid case, which I cited yesterday, where help wasn't summoned and they didn't show up. Here it was. She just left out a specifying detail. And I submit that that's simply not enough to leave out an important detail to subject one to an allegation of caution-shocking behavior.  GONZALEZ-BROWN That goes sort of back to the beginning of my question. If we're using that intermediate standard, what is the type of deliberateness or consciousness that would meet the standard? MS. GONZALEZ-BROWN I'm sorry. MR. GONZALEZ-BROWN Go ahead. If you understand the question, go ahead. MS. GONZALEZ-BROWN Okay. And tell me if I don't, Judge Porter. Assuming that there were an exercise of authority, assuming there were a restriction of liberty, I suppose if you told firefighters to stay away and not come at all, if you knew the firefighters weren't coming at all and you ordered someone to stay in the room, I suppose that could be caution-shocking. But that's very far from what happened here, as I noted. There's every indication that she thought that the firefighters were going to get there. In fact, according to the complaint, they tried to get up there.  GONZALEZ-BROWN Let me ask you this follow-up to Judge Porter's question. I chatted with your adversary a little bit about the hyper-pressurized environment. It seems that the cases that talk about that are generally talking about instances where individuals are in positions to make snap judgments or split-second decisions. Could you put the PFD dispatcher aside for a moment? Let's just focus on the PFD operator. Should we consider the PFD operator to be operating in that kind of environment? TAYLOR GILCHRIST Yes, Your Honor, in the sense that the demand in this situation is to relay the information to the dispatcher and therefore to the firefighters as quickly as possible, because you have a fire on hand, so you do have a hyper-pressurized environment. You do have a situation where she had to act without deliberating. She couldn't sit there and write an essay about what Ms. Johnson told her. She had to relay that information quickly. In that sense, that's what makes it less likely that it's going to be a conscious, shocking, deliberate disregard as opposed to just a tragic error. GONZALEZ-BROWN I thought that the cases were trying to draw a distinction between a stressful situation on the one hand and what I saw as a hyper-pressurized environment, which was something different than stressful, because I'm not sure any of these jobs you could argue aren't stressful. You can maybe argue levels of stress, and certainly this is a stressful job. But I thought that the cases were trying to make a different point. Your adversary talked about the fact that the PFD operator was on the phone for eight minutes with Ms. Johnson. I don't know that the eight minutes is particularly important, but over that time, there were no that I could discern, tell me if I'm wrong. There were no split-second judgments to be made. It was the relaying of information and then talking to Ms. Johnson, whether it be instructions, assurances, calming her down, whatever the case may be. So with putting stressful situations aside, does it really attend to what the court and Lewis talked about and other cases that have followed? Yes, Your Honor, it is. And that's, again, Lewis spends a lot of time on timing. And Mr. Villar talked about the eight minutes, but that was after the immediate relay of information to the dispatcher. She couldn't spend a lot of time communicating, obtaining the information and relaying it to the dispatcher. She had to do that quickly. And again, I think that time and sort of the pressure are all things that the Lewis court says matter when you're determining whether a mistake that someone made is something that's an egregious abuse of authority versus, like I said, a tragic error or something that's negligent. And again, I think the eight minutes do come into play because it demonstrates that she thought she had told the dispatcher what she needed to tell them, because she then spent all that time trying to give Alita instructions to keep herself safe and to stay calm. Is there a recording of the communication between the PFD operator and the PFD dispatcher? Your Honor, this is outside the record, but my client has actually been unable to find one at this point. And I've been able to find that exact subpoena request and response that Mr. Valaria made. I don't deny he made it. It's just something I haven't been able to track down myself. And my clients haven't been able to track down the recording. Those are things that only exist for a certain amount of time. Is that a normal part of your... I know this is also outside of the record, but I'm just curious. Is it a normal part of your client's process that that communication would be recorded for some period of time? I'm definitely not a specialist on this, Judge Greenaway, so don't hold me to it. But I do know that there are some very specific preservation requirements on recordings. I just don't know what they are. I wanted to shift to Monel unless my colleagues had questions. No, that's fine with me. It's Judge Meade, if I could just ask one follow-up question. So make sure I understand, counsel, what you're arguing. In my following, the points on the standards that this court and others have used to evaluate conduct assumes at the beginning that there was some deliberate choice by the fact. In other words, we evaluate that deliberate choice based on various lenses, depending on the circumstances and the amount of time for reflection and deliberation. But we assume in each case that what has happened first is a deliberate choice to do or to not do something. Is that accurate? I'm not sure I understand your question, Judge Meade. And I think maybe part of this gets hung up in the fact that some cases that interpret what caution shocking means are deliberate in different means. In different means, there are cases where there's already been a custodial act or someone's incarcerated or institutionalized, and then we're only looking at the omission part of the analysis. And I guess my point was that we can't uncouple that. In a security danger case, we can't uncouple those two things here. There has to be a restriction. Well, better stated than I did. The point is that there was always an act that first grounded the analysis. There was nothing, there's no cases or we haven't examined the case yet where there is simply called omissions, called pure negligence, which we then decide, well, let's see whether or not that was reasonable under the circumstances. Yes, absolutely, Judge Meade. And I'd invite the court's attention back to DeShaney for that. And DeShaney even says, DeShaney creates a problem for this case, for Yee, for Bright, for all of these cases in the sense that it says our mere knowledge of the fact that you are in danger or even our expression of intent to help you is not what gets us on the hook for purposes of the substantive due process clause. What gets us on the hook is that we've somehow imposed our authority on you. We've restricted your liberty to help yourself elsewhere and therefore that's what converts it into an abuse of authority, an abuse of authority, which is what the substantive due process clause addresses. It doesn't address our lapses, our omissions, things like that, inadequate rescue. Thank you, counsel. Counsel, I just want to change our focus to Monel, please. I wonder if you could help me on something. Where in the district court opinion does he address the part of the Monel claim that concerns training, custom, and policy? Because it seems to me in the absence of that, there's a gap in the analysis. Respectfully, Judge Greenaway, let me take a look. Let me switch back a little bit on that. That's what an argument's all about, right? I think that what the court concluded is that when the court applies Brown, the court concludes, well, it doesn't really matter what the Monel allegations were. If there's not an underlying constitutional violation and if there's not an allegation that that lack of training was going to lead to, was somehow causally linked to unconstitutional conduct, then the inquiry ends. And that's why the inquiry ended here because the Monel allegations here, assuming Fagan is still good law, all Fagan says is, yes, it's possible if the underlying actors did not commit a constitutional violation that a municipality could still commit it. But the Brown case took that, made that assumption too. And the Brown case says, well, yes, in the abstract, there can be municipal liability. However, you've got to allege that what you're claiming the municipality did was going to lead to a constitutional violation here. And here, the allegations are very general. The allegations are that we didn't properly train fire department employees how to communicate information properly. And I would submit all that could lead to, it's a very general allegation. It doesn't really satisfy an Iqbal or Twombly standard, but even if it did, there's no explanation as to how that would lead to a constitutional violation. It might lead us to be inadequate in our attempts to rescue people from fires, but that's the same allegation that was made in Brown. And that meant the court granted some adjudicent on it. There's just nothing there that would link it to a state-created danger. And if I could just make a couple of comments on that, on some things Mr. Valari said along those lines. I mean, he kept alluding to the fact that, well, I need discovery, but I'm sure this court has seen and my office has won many cases on a motion to dismiss. You still have to satisfy Iqbal and Twombly and you still have to be specific enough in your allegations about what that conduct on our part was, about what the municipal liability allegations are for the court to find that there's a causal link to unconstitutional conduct. Mr. Valari also was referring to something about radio tapes. I don't remember seeing that anywhere in the complaint. And again, you know, I invite the court's attention back to Iqbal and Twombly on that. We're taking the Monell allegations as we see them and particularly assuming if there's no unconstitutional conduct on the part of the actors here, I'm not seeing how those allegations could lead to a causal link to unconstitutional conduct on the part of fire department employees. Okay, Judge, maybe Judge Porter. Nothing further. Nothing for me. Okay, thank you so much. Thank you, counsel. We're going to recall your adversary back for rebuttal. Thank you so much. Thank you. Thank you, Judge Greenway. Leonard Valari again on behalf of Tameka Johnson. Just very briefly, I know that I only have two minutes. Yee and Bright are completely different cases than our case and completely different cases from Revis and Knight. What I think are fundamental differences between my colleague and myself is what is a mere assurance as opposed to an affirmative actor and instruction? My case could not be more different than Yee versus United States. In that case, yes, the patient went to the doctor six times. He comes back. Nothing's getting better. He's complaining of shortness of breath. He's given some cough medicine and sent on his way. Nothing restricted his ability to take himself to the emergency room. That is the absolute difference between my case and a gentleman who's suffering from shortness of breath. His movements weren't restricted by the doctor and they weren't restricted by his physical limitations at the time. My client was already restricted on the third floor and then told to further restrict herself. That's more than a mere assurance when someone says they are on their way but you have to do X, Y, and Z. That's a different case than Yee. Same thing with Bright versus Westmoreland. There was a delay in revoking the defendant's probation but the court correctly reasoned that nothing prevented the father of the 12 and 8-year-old daughters from seeking refuge away from this, for lack of a better term, child molester. Nothing restricted their movement to do so. The 14th Amendment has never guaranteed citizens in this country the right to absolute protection by its government. What they do guarantee is that when the government acts to make them more vulnerable, then it is actionable. And then just very briefly, the case the counsel cited to, which I'm sure the panel will consider and I have no objection to it, the Wreak case is a 10th Circuit case from, I believe, 2016. Again, could not be more different than the facts of my case. In that case, individuals in a car were attacked by people with bottles and they were harmed and they continued to drive through Denver into another city. They called 911 and the 911 operator in that case said, I can't help you to report this and to take care of you unless you come back to Denver. Like the Yee case and like the Bright case, nothing restricted them from continuing to drive all the way to California, if they wanted to, to get away from them. They made the conscious decision to go back to Denver, to go back to their attackers and when they did, one of them was tragically shot and killed. That's not foreseeable. That is really bad advice. It's negligence, but it is not an act that made them more vulnerable because they had a choice. Alita Johnson didn't have a choice. Thank you. Let me ask you a question about your adversary's response to my raising the Phillips case with regard to amendments and futility. It is correct that you have not made, did not have an opportunity to amend the complaint. Is that correct? Actually, technically, I was given an opportunity to amend the complaint only as it related to the equal protection claim against Commissioner Thiele, but having seen the well-reasoned opinion with respect to that count, we've abandoned that claim and asked the judge to deny that claim as well so that I can move on to the Third Circuit, but I know what your next question is going to be, which is you did not request of the district court to amend your complaint. When I read the complaint, I realized that I had to go to the Third Circuit because of the issues that I believed were error. That was my decision, and quite frankly, counsel is correct. I guess I could have asked the judge to amend this decision, but having read his opinion in this case and having reviewed the Third Circuit case law, I felt more confident in respectfully applying for an appeal to the Third Circuit based on their interpretation of the case law. For right or wrong? As Johnny Mathis said, it's not for me to say. So anything further, Judge Porter or Judge Mady? No, sir. No, nothing further. Thank you. Counsel, we appreciate your arguments. We'll take the matter under advisement, and I wish the best to you and your families to remain safe during this time of national crisis. Thank you very much.